UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| GARY L. THARES,<br><br>Plaintiff,<br><br>vs.<br><br>DR. MEL WALLINGA, BRENDA MUDDER, KELLIE WASKO, SECRETARY OF CORRECTIONS; OFFICIAL CAPACITY,<br><br>Defendants. | 4:21-CV-04107-RAL<br><br><br>OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Plaintiff Gary L. Thares filed a pro se civil rights lawsuit under 42 U.S.C. § 1983 and the

Americans with Disabilities Act (ADA). Doc. 1. This Court granted Thares leave to proceed in

forma pauperis and ordered him to pay an initial partial filing fee. Doc. 5. After Thares timely

paid his initial filing fee, this Court screened Thares's complaint under 28 U.S.C. § 1915A. Doc.

11. Thares's claim for injunctive relief to award Earned Discharge Credits against Kellie Wasko,

Secretary of Corrections, in her official capacity, survived screening.[1] Doc. 11 at 6–7, 12.

Thares's claim for injunctive relief for conditions of confinement in violation of the Eighth

Amendment and Title II of the ADA against Kellie Wasko, Secretary of Corrections, in her

---

[1] The Complaint named South Dakota Secretary of Corrections Mike Leidholt as a defendant in his official capacity. Doc. 1 at 2. As this Court noted in its 1915A Screening, Mike Leidholt is no longer the South Dakota Secretary of Corrections. Doc. 11 at 4, n.1. Tim Reisch, who was the Interim Secretary of Corrections, was automatically substituted for Mike Leidholt pursuant to Fed. R. Civ. P. 25(d). Id. Subsequently, this Court granted Defendants' motion to substitute Kellie Wasko, in her official capacity as the Secretary of Corrections for the former Interim Secretary of Corrections. Doc. 82.

official capacity, survived screening. Id. at 10, 13. Finally, Thares's claim for injunctive relief

for deliberate indifference to serious medical needs against unnamed medical staff and B.

Mudder, in their official capacities, survived screening. Id. at 8–10, 13. When Thares completed

and sent to the Clerk of Courts a separate summons for each defendant, he identified the

unnamed medical staff by completing a summons for Dr. Mel Wallinga. See Doc. 18 at 1, n.1.

Defendants have filed a motion for summary judgment. Doc. 71. Thares also filed a

motion for summary judgment, Doc. 69, but Thares's motion is based only on the passage of

time since the commencement of the action and provides no basis for this Court to enter

summary judgment in accordance with Fed. R. Civ. 56(a). Doc. 69. Further, Thares did not, as

required by D.S.D. Civ. LR 56.1.A, support his motion for summary judgment with a statement

of material facts presenting each material fact "in a separate numbered statement with an

appropriate citation to the record in the case." Thares filed a second motion for summary

judgment, stating that his "health is in jeopardy" and his rights under the ADA are "seriously

being violated." Doc. 84. Again, Thares did not support his motion for summary judgment with

a statement of material facts as required by D.S.D. Civ. LR 56.1.A and has not submitted any

record evidence to support the conclusory allegations in his motion. Defendants did not respond

to Thares's motions for summary judgment in accordance with D.S.D. Civ. LR 7.1.B. However,

"[e]ven if a motion for summary judgment on a particular claim stands unopposed, the district

court must still determine that the moving party is entitled to judgment as a matter of law on that

claim." Interstate Power Co. v. Kansas City Power & Light Co., 992 F.2d 804, 807 (8th Cir.

1993). For the reasons set forth below, Thares is not entitled to judgment as a matter of law on

any of his claims that survived screening, and Defendants are entitled to judgment as a matter of

law on all of the claims that survived screening.

Thares has filed multiple other motions seeking miscellaneous relief. See Docs. 97, 99, 101, 107, 108, 109, 111, 112, 114, 117, 119, 121, 122, 127, 128, 129, 132. Many of Thares's motions are duplicative of motions he has previously filed and this Court has denied. Others seek relief beyond the scope of this Court's jurisdiction in this § 1983 action. Thares's miscellaneous motions are outlined and discussed below.

## I.   FACTUAL BACKGROUND

When Thares commenced this action under 42 U.S.C. § 1983, he was incarcerated at Mike Durfee State Prison (MDSP) in Springfield, South Dakota. Doc. 1 at 1. Thares came into custody of the South Dakota Department of Corrections on June 24, 2020. Doc. 73 at ¶ 9. Initially, he was housed in the Jameson Annex at the South Dakota State Penitentiary. Id. He was transferred to MDSP on July 17, 2020. Id. On March 30, 2023, Thares was released on parole. Doc. 131 at 1. Thares has advised this Court that he is residing at The Glory House in Sioux Falls, a nonprofit residential facility that provides services and supervision to reintegrate inmates into the community, which is sometimes referred to as a "halfway house". See SDCL § 24-2-27.1; Docs. 116, 125.

In accordance with D.S.D. Civ. LR 56.1.A, Defendants filed a statement of material facts presenting each material fact "in a separate numbered statement with an appropriate citation to the record in the case." See Doc. 80. As the party opposing summary judgment, Thares "must respond to each numbered paragraph in the moving party's statement of material facts with a separately numbered response and appropriate citations to the record." D.S.D. Civ. LR 56.1.B. "All material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's response to the moving party's statement of material facts." D.S.D. Civ. LR 56.1.D; see also Fed. R. Civ. P. 56(e)(2) (providing that the

3

court can consider a fact undisputed when a party "fails to properly address another party's assertion of fact as required by Rule 56(c)"). This rule apples even when the nonmoving party is proceeding pro se. Johnson v. Kaemingk, 4:17-CV-04043-LLP, 2020 WL 1441713, at *1, 2020 U.S. Dist. LEXIS 51762, at *2 (D.S.D. Mar. 23, 2020) (deeming facts admitted where a pro se plaintiff filed an opposition to a motion for summary judgment but did not comply D.S.D. Civ. LR 56.1.B); Joe v. Walgreens Co/ILL, 4:09-CV-04144-RAL, 2010 WL 2595270, at *1, 2010 U.S. Dist. LEXIS 62567, at *2 (D.S.D. June 23, 2010) (deeming facts admitted where a pro se nonmoving party did not submit a statement of material facts or directly respond to the moving party's statement of material facts): see also Bunch v. Univ. of Ark. Bd. of Trs., 863 F.3d 1062, 1067 (8th Cir. 2017) (holding that a litigant's pro se status does not excuse him from following the district court's local rules).

Although Thares has filed pleadings opposing Defendants' Motion for Summary Judgment, see Docs. 103, 131, he has not responded to Defendants' Statement of Material Facts with separately numbered paragraphs and appropriate citations to the record, as required by D.S.D. Civ. LR 56.1.B.[2] Thares disputes the contents of the affidavits Defendants submitted in support of their Statement of Material Facts because "none of [the affiants] know anything about [him] and most of what they say is hear say [sic] with no truth." Doc. 103; see also Doc. 131-1 at 1–3. This Court has reviewed the affidavits Defendants submitted in support of their motion for summary judgment, Docs. 73–79. Each of the affidavits establishes that the affiant has sufficient foundation to support the affiant's averments, which are not inadmissible hearsay.

---

[2] Thares requested and this Court granted three extensions of time for responding to Defendants' Motion for Summary Judgment. See Docs. 86, 90, 126. As a result, Thares had more than five months to respond to Defendants' summary judgment submissions.

Thares's objections to the affidavits are overruled, and Defendants' Statement of Materials Facts, Doc. 80, is deemed admitted because Thares did not comply with D.S.D. Civ. LR 56.1.B.[3]

### A.    Claim for Injunctive Relief for Failure to Award Earned Discharge Credits

When Thares came into custody of the Department of Corrections, he had a wheelchair. Doc. 76 at ¶ 14. Shortly after his incarceration, Thares submitted a request for reasonable accommodation alleging that he was disabled due to chronic obstructive pulmonary disease (COPD) and severe breathing problems, constant hip pain making it difficult to walk, diabetes, and a mental health condition requiring ongoing counseling. Doc. 7 at 45. Health Services at MDSP assessed Thares's ability to work. Doc. 77 at ¶ 11. Throughout most of Thares's incarceration, he was medically cleared to work with certain restrictions or limitations.[4] Medical orders prohibited Thares from having a job that requires that he traverse stairs or stand for prolonged periods of time. Docs. 72-1, 72-2; Doc. 73 at ¶ 5; Doc. 77 at ¶¶ 11–12. He is limited to sedentary jobs. Doc. 72-3; Doc. 73 at ¶ 5; Doc. 77 at ¶ 13. Thares was medically restricted from working due to hip surgery from March 8, 2021, to April 5, 2021. Doc. 72-59; Doc. 73 at ¶ 11; Doc. 77 at ¶ 18. Based on recommendations of the medical staff, Thares was provided with

---

[3] Because Thares's complaint is verified, this Court will consider any specific, non-conclusory facts alleged in the complaint. See Roberson v. Hayti Police Dep't, 241 F.3d 992, 995 (8th Cir. 2001) ("[T]he facts alleged in a verified complaint need not be repeated in a responsive affidavit in order to survive a summary judgment motion."). Thares has also filed various documents, including kites requesting medical care, administrative remedy responses, informal resolution requests, informal resolution responses, and correspondence from Health Services at MDSP, to supplement his complaint and the numerous miscellaneous requests for relief he has filed. See Docs. 7, 12, 21, 66. Although a district court is not required to "plumb the record in order to find a genuine issue of material fact[,]" Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996), to the extent Thares's submissions are relevant to the pending claims, this Court will consider them.

[4] Thares was not permitted to work from July 13, 2020, to July 15, 2020. Doc. 73 at ¶ 10. But this no work order was unrelated to any medical or physical condition. During this time period, Thares was housed in the admissions and orientation unit at Jameson Annex, and inmates are not permitted to work during orientation. Id.

mobility aids, including a cane and wheelchair. Doc. 72-2; Doc. 77 at ¶ 14. As he recovered

from his hip surgery, Thares no longer used a wheelchair. Doc. 76 at ¶ 14. During the time that

Thares was using a wheelchair, he was assigned a "wheelchair pusher," an inmate whose job was

to push Thares's wheelchair. Doc. 72-2; Doc. 76 at ¶ 15; Doc. 77 at ¶ 14.

      South Dakota law provides that the Department of Corrections may grant an inmate

earned discharge credits upon completion of a certain number of hours of satisfactory work.

SDCL § 24-15A-50.1. Earned discharge credits are applied to reduce an inmate's sentence prior

to the calculation of the initial parole date. Id. Thares contends that he has a permanent physical

disability that prevents him from working. Doc. 7-1 at 36. Because his claimed disability

prevents him from working, he alleges that he has been denied the opportunity to acquire earned

discharge credits because of his disability. Id. Thares relies on a statement from the Social

Security Administration that he has been disabled since Dec. 17, 2012, to support his contention

that his physical disability prevents him from working. See Doc. 30; Doc. 30-1. During an

appointment with one of the providers at MDSP, Thares demanded that the provider deem him

disabled so that he could "spend half the amount of time [at MDSP] and get EDC credit." Doc.

72-3 at 1. Thares threatened to sue the provider if she refused to declare him disabled and unable

to work. Id. The provider reviewed Thares's work restrictions and explained that the factors

used to determine whether a person qualifies for Social Security disability differ from the factors

MDSP's providers use to determine whether an inmate can work while incarcerated. Id. at 2.

Thares was encouraged to work with prison staff to find a job that would accommodate his work

restrictions. Id.

      There are various jobs at MDSP that would accommodate Thares's work restrictions.

Doc. 73 at ¶ 6. The jobs could be performed with or without the use of Thares's mobility aids.

Id. at ¶ 7. Prior to his hip surgery and the subsequent no work order, Thares did not apply for any jobs and, therefore, did not receive any earned discharge credits. Doc. 73 at ¶¶ 14, 19.

Although Thares was medically restricted from working for a period of time after his hip surgery, pursuant to the prison's standard practice, he was not eligible to earn earned discharge credits during this medical restriction because he was not working at the time the medical restriction became effective. Id. at ¶ 13. Thares applied for and worked as a wall cleaner from April 8, 2022, until April 11, 2022, when he quit. Id. at ¶ 17. Thares did not work enough hours in this position to earn any earned discharge credits. Doc. 72-28 at 1–2. There is no evidence that Thares worked in any other positions. Doc. 73 at ¶ 18. On November 2, 2022, after this action was commenced, Thares applied for jobs and was on the waitlist for various positions. Id. at ¶ 18. However, after June 29, 2022, Thares was no longer eligible to earn earned discharge credits through work. Doc. 73 at ¶ 20. On June 29, 2022, Thares was terminated early from the Sex Offender Treatment Program for failure to comply. Doc. 72-32. Pursuant to the Offender Earned Discharge Credits Policy 1.4.B.17, inmates who are terminated from the Sex Offender Treatment Program are ineligible to earn earned discharge credits through work. Doc. 72-28 at 2.

### B. Claim for Injunctive Relief for Conditions of Confinement in Violation of the Eighth Amendment and the ADA

In his complaint and the documents he submitted to supplement his complaint, Thares alleges that the conditions of confinement at MDSP violate his rights under the ADA and the Eighth Amendment. Doc. 1 at 4. Thares's conditions-of-confinement claims that survived 1915A screening are that the lack of air conditioning inside the prison and mold in prison bathrooms make his breathing more difficult, that he is not provided adequate wheelchair access

7

to the cafeteria or to the disabled shower, and that he cannot hear the prison loudspeaker and needs headphones which the prison does not provide. Doc. 11 at 10.

In the summer of 2021, Thares submitted kites for medical care claiming that he could not breathe due to the temperature. Doc. 72-11. An air conditioner unit was ordered for his cell beginning on July 29, 2021. Doc. 77 at ¶ 26. The temperature is controlled at seventy-six degrees Fahrenheit. Doc. 12 at 5. On August 18, 2022, Thares was transferred to a fully air conditioned unit. Doc. 134-1 at ¶ 13.

Thares complained about a black, green, and gray mold in the East Crawford first handicapped shower and restrooms and that he "can't breath[e] very well." Doc. 7 at 7; Doc. 22 at 2. Thares was advised that the mold staining in the bathroom is not new or fresh. Doc. 7 at 6. While there are mold stains, there is no active mold. Doc. 72-9 at 1; Doc. 134-1 at ¶ 18. The bathroom is cleaned multiple times a day with bleach. Doc. 134-1 at ¶¶ 17, 19. Thares was also directed to attend sick call if he was having trouble breathing. Doc. 72-9 at 1.

Thares alleges that he was denied adequate wheelchair access to the cafeteria. He asserts that he needs to line up outside the cafeteria before meals so that he has enough time to eat. Doc. 7 at 21, 42. He alleges that he was inappropriately written up for loitering in the first floor hallway while waiting in his wheelchair to go to the cafeteria. Id. at 21, 43. According to Defendants, inmates are not permitted to line up outside the dining area because the unit plan requires that day areas, stairs and hallways must be clear before a floor can be called for a meal. Id. at 20. Lining up outside the cafeteria could cause a delay in Thares's floor being called for a meal. Id. Further, Defendants assert that Thares did not need to line up outside the cafeteria to have adequate access to the cafeteria. There is an ADA compliant table in the cafeteria. Doc. 76 at ¶ 13. At mealtime, Thares's wheelchair pusher pushed him into the cafeteria and placed him

8

at the ADA compliant table. Id. at ¶ 16. The pusher then picked up his both his and Thares's

trays and took the trays to the ADA compliant table. Id.

Thares complained that he was not provided adequate access to a handicapped accessible

shower, but the record reveals otherwise. On August 24, 2020, an order was placed permitting

Thares to use the handicapped accessible shower. Doc. 7-1 at 7. Inmate showers, including the

handicapped accessible shower, are open to inmates from 5:00 a.m. until 10:30 p.m., with the

exception of count times. Doc. 72-7 at 1. Further, when Thares complained that inmates who

were not disabled were using the handicapped accessible shower, prison staff posted a sign

reiterating that use of the handicapped accessible shower is limited to inmates who are

handicapped. Doc. 76 at ¶ 7.

Thares submitted a kite seeking medical treatment because he could not hear the loud

speaker, but he was advised that medical does not issue headphones and directed to speak with

the unit/ADA coordinator. Doc. 7-1 at 25. Thares did not advise either the unit manager or

ADA coordinator that he was having an issue hearing the loud speaker or requesting headphones.

Doc. 73 at ¶ 22; Doc. 75 at ¶ 24; Doc. 76 at ¶ 17.

### C.     Claim for Injunctive Relief for Deliberate Indifference to Serious Medical Needs

Thares alleges that the medical staff at MDSP refused to attend to him despite his need

and desire to see a doctor. Doc. 7 at 14, 35–38. The records reveal that this allegation is more

properly characterized as a disagreement with the Department of Corrections's procedure for

handling an inmate's request for medical care. When an inmate wants to be seen by Health

Services, the inmate is required to submit a kite for medical care, unless it is an emergency. Doc.

78 at ¶ 4. Nurses in Health Services triage medical kites within twenty-four hours of receipt. Id.

at 5. When the nurses triage medical kites, the nurses determine whether the inmate's complaint

can be handled through a nurse protocol based on the nurse's assessment during sick call, a sick

call encounter with a nurse followed by a chart review by a provider, or whether an appointment

with a Health Services or outside provider is necessary and, if so, how urgently the appointment

should be scheduled. Id. at ¶ 6. Because there are nursing protocols including orders, nurses

within the scope of their practice can handle some medical kites without the inmate being seen

by a provider. Doc. 12 at 42, 44, 46; Doc. 78 at ¶ 7. After submitting a medical kite, several

times Thares declined a sick call encounter with a nurse because he wanted to be seen by a

provider. See, e.g., Docs. 72-12; 72-13; 72-15; 72-16; 72-17; 72-41;72-43; 72-46; 72-47. For

example, on April 8, 2021, Thares submitted a medical kite stating that he was "still having

[neurotic] pain in feet[.] Don't want or need [to] go to sick call need help with pain." Doc. 72-

45. After this kite was triaged, Thares refused to see a nurse for sick call because he only wanted

to see a provider. Id.

Thares alleges that a nurse improperly discontinued his pain medication. Doc. 7 at 17.

The record demonstrates that one of Thares's medications, Gabapentin, was tapered and

terminated based on an order from a provider, because Thares failed to comply with a medication

agreement requiring that he ensured all medications were cleared from his mouth prior to exiting

the medication line. Docs. 72-13, 72-23.

On February 3, 2021, Thares complained that he had been at MDSP for several months

and had not "seen a real doctor." Doc. 7 at 35. According to the record, on June 29, 2020, a

physician performed an initial examination and evaluation. See Doc. 72-1. Because of Thares's

chronic health conditions, including chronic obstructive pulmonary disease, hypertension,

hypothyroidism, and Type-2 diabetes, he was scheduled for chronic care labs every six months

or more frequently if ordered by a provider. Doc. 72-20; Doc. 77 at ¶ 32. The lab results are

reviewed by a provider and then communicated to Thares via medical correspondence or during a follow-up encounter if indicated. Doc. 72-20; Doc. 77 at ¶ 32. A provider saw Thares on December 28, 2020, for a chronic disease encounter, including reviewing his lab results. Doc. 72-3. The record also demonstrates that Thares was seen by a provider on July 20, 2020, because he was having difficulty walking long distances. Doc. 72-2.

After the July 20, 2020, encounter, Thares was scheduled for an orthopedic surgery consult. Doc. 7-1 at 14. The consulting surgeon performed a hip replacement surgery on February 22, 2012. Doc. 78 at ¶ 14. To address his hip pain prior to his surgery, a provider at MDSP ordered use of a TENS unit for up to twenty minutes twice daily. Doc. 7-1 at 27. Thares alleged that TENS unit was "broken". Id. According to the record evidence, for one day while the order was in effect, the TENS unit in Thares's housing unit was missing a cord. Doc. 77 at ¶¶ 4-8. However, that unit was replaced on the same day that the cord was reported missing. Id. at ¶¶ 6-7.

Thares alleges that he has been in severe pain since his hip replacement surgery and that he has not healed correctly from the surgery. Doc. 1 at 6. According to Thares's medical records, his hip healed properly, although he continued to complain of pain. Thares's medical records indicate that Thares's pain complaints were treated. After the surgery, Thares was prescribed Hydrocodone four times a day for five days, along with Tylenol and Gabapentin, for pain. Doc. 72-49 at 1, 3. He was instructed to restart Melixcam for pain on April 1, 2021. Id. at 6. On March 8, 2021, Thares was seen for a post-operative visit. Doc. 72-50 at 3-5. A review of x-rays of his pelvis and left hip demonstrated that the implant was in good position. Id. at 4; Doc. 78 at ¶ 15. Thares's surgeon ordered physical therapy twice a week for six weeks to help with mobilization and strengthening of his left lower extremity, but Thares did not attend his

scheduled therapy. Doc. 7-1 at 31; Doc. 72-50 at 2, 5. Approximately a month later, Thares was seen for his six-week post-operative appointment. Doc. 72-51. His wounds had healed, the x-rays looked stable, and there was nothing abnormal. Id. at 4; Doc. 78 at ¶ 16. At the time of his three-month post-operative appointment, Thares's wound had healed, the x-rays looked stable, and there was nothing abnormal. Doc. 72-52 at 3–4; Doc. 78 at ¶ 17. He reported occasional pain and that the pain medications that he was taking, Tylenol, Mobic, and Cymbalta, were not effective. Doc. 72-52 at 1. Thares's surgeon recommended a steroid injection because of Thares's pain complaints. Id. at 4.

Thares was seen for a seven-month post-operative follow up on September 20, 2021. Doc. 72-55 at 5. According to his surgeon, the x-rays demonstrated that the implant was in good position and stable. Id. Thares reported persistent, occasional pain, and he was taking anti-inflammatory medication, along with Tylenol. Id. at 3, 5. The surgeon informed Thares that he would likely continue to see improvements in his left hip symptoms for another few months. Id. at 5. Thares continued to see his surgeon for follow-up appointments. Docs. 72-56; 72-58. None of the records from these visits indicate that his hip failed to heal properly. Docs. 72-56; 72-57; 72-58.

In a supplement to his complaint, Thares asserts that a nurse lied by understating one of his blood pressure readings. Doc. 7-1 at 22. However, Thares has neither submitted any evidence to support this allegation nor identified the date or the nurse who allegedly lied. Thares also asserts that his blood pressure is always high and that Health Services had stopped checking his blood pressure. Id. at 38. The medical records and other documents submitted by Defendants refute Thares's assertion that Health Services had stopped checking his blood pressure. See Doc. 72-21 at 4, 9, 13, 17, 20, 24, 27, 30; Doc. 72-35; Doc. 72-39; Doc. 77 at

¶¶ 34–35. The same records and documents demonstrate that Thares has been prescribed a medication to manage his high blood pressure. Doc. 72-21 at 4, 9, 13, 17, 20, 24, 27, 30; Doc. 72-35; Doc. 72-39; Doc. 77 at ¶ 35. In fact, Thares's handwritten note alleging that his blood pressure is always high is on a medical communication, dated December 14, 2020, advising him that the dose of his blood pressure medication had been increased on the basis of his blood pressure checks. Doc. 7-1 at 38. During his next chronic health encounter on July 2, 2021, the provider documented that Thares's hypertension was under good control and that no change in his medication was needed. Doc. 72-21 at 6.

Thares contends that he received inadequate medical care for a finger injury. Doc. 7 at 36–38. On November 30, 2020, Thares presented to Health Services "to see a nurse for an emergency." Doc. 72-18. He reported that he had smashed his finger and would like it looked at. Id. His right pinky fingernail was bruised, and the tip of his finger was redish pink. Id. The nurse advised that there is not much that can be done for a bruised fingernail. Id. Thares responded that he was going back to his unit and stick a pin in his fingernail to drain and relieve pressure. Id. The nurse advised Thares against sticking a pin in his fingernail and recommended that he return to his unit and submit a medical kite so that he could be seen the next day. Id. Thares was upset by the nurse's response and threatened to grieve her. Id. The next day Thares was seen during sick call. Doc. 72-19 at 1. His reported that his finger was bruised and swollen and asked to have it "cut open to drain." Id. at 1. On examination, the tip of the finger was mildly swollen and red. Id. at 3-4. The nail was intact but bruised with blood underneath. Id. at 4. In accordance with a skin assessment nursing protocol, the nurse advised Thares that opening the area to drain was not indicated because it would introduce bacteria and put him at risk for

13

infection. Id. Thares was advised to ice the affected area and assured that the blood would
reabsorb with time. Id.

Thares alleges that he has "bad diabetic problems," Doc. 1 at 6, and that Defendants
refused to let him to a doctor who specializes in diabetes, Doc. 1 at 4. However, the record
indicates that Health Services at MDSP was monitoring and managing his diabetes. Thares was
seen by an onsite provider every six months for his diabetes. Doc. 72-17. But the record
indicates that Thares refused blood sugar checks, Docs. 72-37, 72-40, and refused insulin, Doc.
72-38. When a provider determined that Thares's diabetes was under poor control in part
because Thares did not take his afternoon dose of Metformin because he believed the weather
was too hot for him to report for the afternoon MedPass, the provider ordered a long-lasting form
of the medication that could be administered only in the morning. Doc. 72-25 at 2, 4. Finally,
although Thares demanded that he be referred to a specialist, he refused to comply with the
prerequisite step of attending sick call with a nurse. Doc. 72-42; Doc. 72-43 ("Informed him that
he can't just put in a request to see a specialist, he needs to attend sick call and be assessed by a
nurse. If [needed], it would then to go to a provider onsite to review.").

During a chronic health encounter in late 2020, Thares denied any shortness of breath,
but reported that if he was up and moving around, he would possibly be short of breath. Doc.
72-3 at 1. He reported that he had not been using his CPAP but said nothing about the device not
functioning properly. Id. at 2-3. The provider explained that oxygen was not indicated for
Thares's COPD but encouraged use of the CPAP. Id. at 3. Following an assessment by a nurse
during sick call, Thares was scheduled to see an outside pulmonologist because of his COPD.
Doc. 7-1 at 19. While the request for a pulmonology consult was pending, a provider at MDSP
recommended that Thares use his CPAP at night. Id. at 29. To supplement his complaint,

Thares handwrote on the January 19, 2021, medical correspondence forwarding this recommendation that "CPAP does not work right[.] Nurse not authorized to fix." Id. However, Thares has not cited any record evidence to support his allegation or to indicate any report at that time to Health Services that the device was not functioning.

A few months later, when Thares did report to Health Services that his CPAP was not functioning properly, he was asked to bring the device Health Services. Doc. 7 at 5; Doc. 72-10. One of the nurses informed Thares that she would evaluate why the device was not functioning properly. Doc. 7 at 5. Thares responded that he does not use his CPAP and Health Services should just keep it. Doc. 72-10 at 1. Because Thares neither trusts the nurse nor believes nurses are authorized to fix CPAPs, he asserts that he should have been provided a different device that functioned properly instead of Health Services attempting to repair the device. Doc. 7 at 5. Thares was advised if he wanted to re-start his CPAP that he would need to submit a medical kite. Doc. 72-10 at 1. There is no record evidence that Thares submitted a kite seeking to re-start his CPAP.

## II.   ANALYSIS

### A.   Thares's Motions to Extend the Motion Deadline

Defendants filed a motion requesting that this Court enter an order establishing a deadline for filing dispositive motions. Doc. 40. Thares did not object to or otherwise respond to Defendants' motion. Accordingly, this Court granted Defendants' motion and entered an order providing that the deadline for all dispositive motions in this case will be January 31, 2023. Doc. 95 at 9, 11. After this Court granted Defendants' motion and ordered that the deadline for all dispositive motions will be January 31, 2023, Thares filed an untimely objection to Defendants' motion and requested that the motion deadline be extended until after March 24, 2023, when he

anticipated being paroled. Doc. 99. Defendants oppose Thares's request for an extension of the

motion deadline. Doc. 104. In this case, Thares's incarceration is not a good cause to extend the

motion deadline. As previously noted, Thares filed two motions for summary judgment prior to

the motion deadline. See Docs. 69, 84. Further, before requesting an extension of the motion

deadline, Thares filed numerous requests for a hearing as well as several requests that this Court

rule on the merits of his claims. See Docs. 34, 39, 46, 57, 60, 61, 62, 63, 64, 65, 67, 92, 93.

Thares's motion requesting an extension of the motion deadline, Doc. 99, is denied.

Thares filed a second motion requesting an extension of the motion deadline until after he

is paroled to permit him an opportunity to hire an attorney. Doc. 108. Since being paroled,

Thares has had ample time to retain counsel, but no attorney has appeared on his behalf.

Thares's motion to extend the motion deadline to permit an opportunity to retain counsel, Doc.

108, is denied.

### B.    Thares's Motions Seeking Discovery

After Defendants filed their motion for summary judgment, Thares filed motions

requesting that this Court order responses to Thares's requests for information. Thares seeks an

order requiring the Department of Corrections to provide information regarding any benefits the

Department of Corrections has received from the federal government due to Thares's age or

Social Security disability. Doc. 101. Because Thares's claim against the Department of

Corrections did not survive screening, the Department of Corrections is not a party to this action.

Doc. 11 at 5–6, 12. Thares seems to be requesting an order compelling a non-party to respond to

a discovery request, which is improper. To the extent Thares's motion can be construed as a

motion to compel Defendant Wasko, in her official capacity, to respond to a discovery request,

16

the motion is denied because Thares had not made any showing that he served a valid discovery request or how the information he seeks may be relevant to his pending claims.

Thares requests that this Court enter an "order to show cause" why seven inmates he alleges received earned discharge credits because of disability are different than Thares. Doc. 109. To obtain such information, Thares should have served an interrogatory on Defendants under Fed. R. Civ. P. 33. The record does not indicate that Thares has served any such discovery request. Thares's pro se status does not excuse him from complying with the Federal Rules of Civil Procedure if he wants to conduct discovery. Baker v. Immanuel Med. Ctr., 2007 WL 2914547, at *2, 2007 U.S. Dist. LEXIS 74102, at *4–5 (D. Neb. Oct. 3, 2007) (stating that a district court has no authority to affirmatively assist a pro se plaintiff in performing discovery). Thares's motion for an order to show cause, Doc. 109, is denied.

### C.    Defendants' Motion for Summary Judgment

#### 1.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (citation omitted). There is a genuine issue of material fact if "a reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). "Mere allegations,

unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007).

### 2. Claim for Injunctive Relief for Failure to Award Earned Discharge Credits

Before considering the merits of Thares's claim seeking injunctive relief against Kellie Wasko in her official capacity for failure to award Earned Discharge Credits, this Court must determine whether it has subject matter jurisdiction over this claim. In Preiser v. Rodriguez, 411 U.S. 475, 500 (1973), the Supreme Court held that "when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." Id. at 500. In this case, Thares's claim seeking injunctive relief in the form of earned discharge credits, which Thares contends he was not provided due to his disability in violation of Title II of the ADA, is a request for a speedier release. See Doc. 1 at 7 ("I would like to get earned discharge credits."). Thus, his sole federal remedy is a writ of habeas corpus.

In Minter v. Bartruff, 939 F.3d 925 (8th Cir. 2019), the Eighth Circuit considered claims by sexual offender inmates that they were excluded from a sexual offender treatment program that would have permitted them to accrue earned-time credits that would shorten their term of imprisonment. The plaintiffs argued that their exclusion from the program deprived them of their Fourteenth Amendment procedural and substantive due process liberty rights and to equal protection of the law. Id. at 926. In their §1983 complaint, they sought actual and punitive damages, attorneys' fees, and entry of on order mandating recalculation of earned-time credits. Id. The Eighth Circuit explained that "[g]ood-time (or earned-time) credits usually shorten an

18

inmate's sentence.  Therefore, when an inmate alleges unlawful deprivation of good-time credits, the relief he seeks is immediate or speedier release from imprisonment and 'his sole federal remedy is a writ of habeas corpus.'"  Id. at 928 (quoting Preiser, 411 U.S. at 500).  Because the plaintiffs were seeking restoration of earned-time credits, the Eighth Circuit held that habeas corpus was the exclusive federal remedy for this claim.  Id. at 929.  See also Wolff v. McDonnell, 418 U.S. 539, 554–55 (1974) (stating that Preiser forecloses a §1983 action seeking injunctive relief restoring good-time credits); Portley-El v. Brill, 288 F.3d 1063, 1066 (8th Cir. 2002) (holding that the district court properly dismissed a § 1983 claim seeking restoration of good time credit as barred by Preiser); Bogovich v. Sandoval, 189 F.3d 999, 1004 (9th Cir. 1999) ("If an ADA claim challenges the validity or duration of confinement, the prisoner's sole federal remedy is the writ of habeas corpus."); Kogut v. Ashe, 592 F. Supp. 2d 204, 206 (D. Mass. 2008) (recognizing that an inmate's claim that he was barred from work programs that may have the effect of reducing his sentence due to disability discrimination in violation of Title II of the ADA is sufficient to state a colorable claim for habeas relief).  Because Preiser bars Thares's § 1983 claim seeking injunctive relief against Wasko in her official capacity for failure to award Earned Discharge Credits, Wasko is entitled to summary judgment on this claim.

Preiser also mandates denying Thares's motions to be released on his original parole date, Docs. 117, 121, motion to be released to serve parole at his residence, Doc. 127, motion to be released from parole at The Glory House, Doc. 129, and motion seeking injunctive relief regarding his conditions of parole, Doc. 132,[5] be denied.  In this § 1983 action, this Court does

---

[5] Notably, neither The Glory House nor any of The Glory House staff members who administer Thares's medication and cause him to "feel [his] life is in severe danger", Doc. 132 at 1, are named as defendants.  Further, the orders Thares references regarding alleged limitations and restrictions were entered prior to his hip surgery.

not have authority to alter the conditions of Thares's parole. See Bass v. Mitchell, 1995 WL 244043, at *1, 1995 U.S. App. LEXIS 9663, at * 3 (8th Cir. 1995) (per curiam) (stating that challenges to conditions of parole must be brought by means of a habeas petition); Drollinger v. Milligan, 552 F.2d 1220, 1224-25 (7th Cir. 1977) (holding that challenges to conditions of probation must be brought by means of a habeas petition rather than a § 1983 action).

### 3. Claim for Injunctive Relief for Conditions of Confinement in Violation of the Eighth Amendment and the ADA

Thares's claim for injunctive relief for conditions of confinement in violation of the Eighth Amendment and Title II of the ADA against Kellie Wasko, Secretary of Corrections, in her official capacity, survived screening. Wasko is entitled to summary judgment on this claim for two reasons. First, because Thares was paroled on March 30, 2023, Doc. 131 at 1, Thares's official capacity claim against Wasko for injunctive relief arising out of his conditions of confinement at MDSP is moot because he is no longer in custody at MDSP. See Hickman v. Missouri, 144 F.3d 1141, 1142 (8th Cir. 1998) ("Because plaintiffs have been released on parole and are no longer confined at [the Western Missouri Correctional Center], their claims are moot.").

Wasko is also entitled to summary judgment on Thares's conditions of confinement claim because Thares failed to exhaust all available administrative remedies. The Prison Litigation Reform Act (PLRA) provides that an inmate must exhaust all available administrative remedies before bringing an action with respect to prison conditions under either § 1983 or any other federal law. 42 U.S.C. § 1997e(a); Booth v. Churner, 532 U.S. 731, 741 (2001). This mandatory exhaustion requirement applies broadly to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002); see also Jones v. Bock, 549

U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in [federal] court." (citation omitted)). The PLRA requires "immediate dismissal" of all unexhausted claims. Gibson v. Weber, 431 F.3d 339, 341 (8th Cir. 2005).

Before filing this action, Thares was required to fully and properly exhaust his administrative remedies as to each claim in the complaint. See Johnson v. Jones, 340 F.3d 624, 627 (8th Cir. 2003). To properly exhaust his administrative remedies regarding his conditions of confinement at MDSP, Thares must comply with MDSP's procedures. Woodford v. Ngo, 548 U.S. 81, 102 (2006) (stating that "proper exhaustion" under the PLRA requires prisoners to comply with the prison's deadlines and procedures). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Bock, 549 U.S. at 218.

The South Dakota Department of Corrections has promulgated a policy that outlines a two-step[6] process inmates must follow to exhaust their administrative remedies before filing a lawsuit. See Doc. 72-5. First, the inmate must file a Request for Informal Resolution. Doc. 72-5 at 6-7; Doc. 74 at ¶ 8. If the inmate is not satisfied with the response to Request for Informal Resolution, then the inmate, as the second step, must file a Request for Administrative Remedy. Doc. 72-5 at 7–8; Doc. 74 at ¶ 10.

Wasko has submitted evidence that Thares's institutional file contains no record that he properly exhausted his administrative remedies by submitting Requests for Informal Resolution

---

[6] For grievances involving certain issues, the inmate is required to appeal to the Secretary of Corrections. See Doc. 72-5 at 8–9. None of Thares's condition of confinement claims arise out of issues that must be appealed to the Secretary of Corrections.

21

and Requests for Administrative Remedy in connection with his claim that he was denied adequate wheelchair access to the cafeteria, that he was not provided adequate access to the disabled shower, that the lack of air conditioning inside the prison makes his breathing more difficult, and that he cannot hear the prison loadspeaker and needs headphones which the prison does not provide. Doc. 74 at ¶¶ 22, 23, 26, 27, 28. Thares has not presented any evidence to demonstrate that he exhausted his administrative remedies regarding these claims. Because it is undisputed that Thares did not exhaust his administrative remedies, Wasko is entitled to summary judgment on Thares's conditions of confinement claim for this alternative reason as well.

In a supplement to his complaint, Thares complains about mold in prison bathrooms. Doc. 7 at 7. The record establishes that Thares did exhaust his administrative remedies with respect to this claim. Doc. 74 at ¶ 21. Nevertheless, Wasko is entitled to summary judgment because only a claim for injunctive relief, which is now moot, survived screening. Further, Thares submitted no evidence to dispute that the bathrooms are cleaned multiple times a day with bleach, which is effective for killing mildew, and that the "mold" Thares reported is a stain rather than active mold. See Doc. 80 at ¶¶ 61–68.

### 4.    Claim for Injunctive Relief for Deliberate Indifference to Serious Medical Needs

Thares's claim for injunctive relief for deliberate indifference to serious medical needs against Dr. Mel Wallinga and B. Mudder in their official capacities survived screening. Doc. 11 at 8–10, 13. According to Defendants' Answer, Dr. Wallinga is a physician employed by the Department of Corrections and Brenda Mudder is a registered nurse employed by the Department of Corrections. Doc. 18 at ¶¶ 7–8; see also Doc. 80 at ¶¶ 3–4. However, because Thares has been paroled, his claim for prospective injunctive relief against Defendants Dr. Mel

22

Wallinga and B. Mudder in their official capacities is moot. See Randolph v. Rodgers, 253 F.3d 342, 345–46 (8th Cir. 2001) (when actions required by an injunction would be impossible for correctional-center defendants to execute because plaintiff has been move to another institution, plaintiff's claims for injunctive relief are moot); Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (holding that plaintiffs' release from custody renders appeal moot when injunctive relief is the only remedy inmates pursued for deliberate indifference to serious medical needs). Accordingly, Defendants Dr. Mel Wallinga and B. Mudder, in their official capacities, are entitled to summary judgment.

Because Thares has been paroled, his motion, Doc. 97, requesting that this Court order a mental evaluation by a licensed psychiatrist because his requests for mental health were denied by Health Services at MSDP, is denied as moot.[7]

### D.    Thares's Miscellaneous Requests for Relief

#### 1.    Investigation and Discipline of Medical Providers

Thares filed a motion to charge Defendants Wallinga and Mudder as well as other medical providers at MDSP with violation of SDCL § 36-9-49. Doc. 107. Thares has also filed motions seeking investigation of Defendant Wallinga for violating various provisions of SDCL

---

[7] Thares has filed other motions seeking mental health evaluations by a psychiatrist. See Docs. 32, 50, 88, and 89. This Court denied these motions because Thares had not shown that "he needs immediate care that Health Services at the Department of Corrections has failed to provide." Doc. 95 at 4. The documents Thares submitted in support of his most recent motion for a mental health evaluation show that was provided mental health services during his incarceration at MDSP. See Doc. 110-1 at 3. However, Thares contends that he should have been evaluated by a licensed physician rather than an allegedly unqualified nurse practitioner and that he does does not trust the mental health providers at MDSP. See id. at 2. Although Thares's motion is moot, this Court notes that is it more properly characterized as a motion requesting that this Court order that he be permitted to select his providers, including mental health providers. Of course, the Eighth Amendment does not require that inmates be permitted to choose their medical providers.

Chapter 36-4. Docs. 112, 114. Thares's pending claims in this action do not give this Court authority to order that South Dakota licensing boards investigate or discipline licensees. See Webb v. Nebraska, 2021 WL 2002925, at *2, 2021 U.S. Dist. LEXIS 95384, at *6 (D. Neb. May 19, 2021) (stating that plaintiff's request that the court enter an order revoking the license of a state mental hospital and requiring a state licensing board and federal law enforcement officers to investigate the plaintiff's allegations are not forms of relief available under 42 U.S.C. § 1983); Herzog v. Scanlan, 2009 WL 1649246, at *2, 2009 U.S. Dist. LEXIS 48278, at *6 (D. Neb. June 9, 2009) (stating that a district court does not have authority to revoke the medical license of a § 1983 defendant because revocation of a medical license is a question of state law governed by state statute); Cranford v. Eyiuche, 2018 WL 3348736, at *3, 2018 U.S. Dist. LEXIS 113682, at *5 (E.D. Cal. July 9, 2018) (holding that plaintiff's request that the court revoke the license and terminate the employment of a nurse who allegedly refused to treat her "is a frivolous demand for injunctive relief, because the court does not have the authority to grant this type of relief under § 1983." (citations omitted)). Thares's motions, Docs. 107, 112, 114, requesting that this Court intervene in the affairs of South Dakota licensing boards are denied.

### 2.  Investigation of the Department of Corrections

Thares filed a motion requesting that this Court investigate Kim Lippencolt for "cohorting with D.O.C. to retalitate against [him] in violation of S.D.C.L. 20-13-26." Doc. 119 at 1. He also requests that this Court order an investigation of the Department of Corrections for slave labor and abuse of the elderly and disabled. Doc. 122. Lippencolt and the Department of Corrections are not parties to this action. Further, this Court has no authority to order

investigation of a state entity and one of its employees[8] as relief in this § 1983 action. Townsend v. Palmer, 2012 WL 2155296, at *3, 2012 U.S. Dist. LEXIS 81753, at *8–9 (N.D. Fla. June 12, 2012) (stating that the court has no authority to order the Florida Department of Corrections to investigate plaintiff's complaints in a § 1983 action); Hankins v. Selig, 2009 WL 3248012, *4, 2009 U.S. Dist. LEXIS 93787, at *13 (E.D. Ark. Oct. 7, 2009) (stating that a district court has no authority to order an investigation of the Arkansas Department of Human Services as relief in a § 1983 action). Thares's motions for investigation, Docs. 119, 122, are denied.

### 3.      Motion to Appoint Counsel

After he was released on parole, Thares filed a motion for appointment of counsel. Doc. 127. This is Thares's fourth motion for appointment of counsel. See Docs. 8, 9, 41. As this Court stated when it denied Thares's previous motions, his claims do not appear to be complex, and he has demonstrated that he has the ability to investigate and present his claims at this phase of the litigation. Doc. 11 at 12, 14; Doc. 95 at 4. In support of his fourth motion for appointment of counsel, Thares has not provided any legitimate reason for this Court to reconsider or revisit its previous rulings. Swackhamer v. Scott, 2008 WL 1969670, at *1 (8th Cir. May 8, 2008) (per curiam) (stating that a court is entitled to rely on its previous rulings denying the appointment of counsel when there is an "absence of any reason to revisit or modify it."). Further, Thares seeks appointment of counsel to assist him in securing a court order directing that he be permitted to serve parole at his residence to escape the "abuse in the highest manner" he alleges that he is experiencing at The Glory House. Doc. 127 at 1. As previously explained, this Court does not

---

[8] According to Thares's submission, Lippencott is an employee of the Department of Corrections with responsibility for assisting inmates in planning for transition from prison custody to parole. Doc. 119-1 at 1.

have authority in this § 1983 action to alter the conditions of Thares's parole. Thares's motion for appointment of counsel, Doc. 127, is denied.

## III.   CONCLUSION

For the reasons stated above, it is hereby ORDERED:

1.  That Thares's motions to extend the motion deadline, Docs. 99, 108, are denied.

2.  That Thares's motions seeking discovery, Docs. 101, 109, are denied.

3.  That Thares's motions for summary judgment, Docs. 69, 84, are denied, and Defendants' motion for summary judgment, Doc. 71, is granted. Thares's claims against Kellie Wasko, in her official capacity, and his claims against Dr. Mel Wallinga and Brenda Mudder, in their official capacities, are dismissed with prejudice.

4.  That Thares's motions for an order to be released on his original parole date, Docs. 117, 121, motion to be released to serve parole at his residence, Doc. 127, motion to be released from parole at The Glory House, Doc. 129, and motion seeking injunctive relief regarding his conditions of parole, Doc. 132, are denied.

5.  That Thares's motion for mental evaluation by a licensed psychiatrist, Doc. 97, is denied as moot.

6.  That Thares's motions requesting investigation and discipline of medical providers, Docs. 107, 112, 114, are denied.

7.  That Thares's motions requesting investigations of the Department of Correction, Docs. 119, 122, are denied.

8.  That Thares's motions for jury trial, Docs. 111, 128, are denied as moot.

9.  That Thares's motion for appointment of counsel, Doc. 127, is denied.

DATED this <u>11th</u> day of May, 2023.

BY THE COURT:

_____

ROBERTO A. LANGE
CHIEF JUDGE